UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| DONNA HOUCK, | ) | CIV. 12-4197-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER GRANTING DEFENDANT |
| vs. | ) | ENGEL'S MOTION FOR SUMMARY |
| | ) | JUDGMENT AND GRANTING IN |
| ESA, INC., and WILLIAM ENGEL, | ) | PART AND DENYING IN PART |
| JR., Individually, | ) | DEFENDANT ESA'S MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| Defendants. | ) | |

Plaintiff, Donna Houck, brought this suit against defendants, ESA, Inc., and William Engel, Jr., asserting various claims arising out of her employment at ESA. ESA and Engel move for summary judgment. Houck resists the motion. The motion is granted as to Engel, and granted in part and denied in part as to ESA.

## BACKGROUND

The facts, viewed in the light most favorable to Houck, the nonmoving party, are as follows:

ESA is a company based out of North Sioux City, South Dakota. Houck began working as an accountant at ESA in January 2010. Around the same time, ESA also hired Pam Todd as an assistant to Houck. Engel worked as a project manager for ESA and spent roughly 40-50 percent of his time in the field and the rest in the ESA office.

ESA is owned by Dennis "Mike" Mitchell, who supervised Houck on a day-to-day basis. Engel and Mitchell were close friends. Houck and Todd were also friends.

In March 2010, Todd began dating Engel. Around this time, Houck's contact with Engel began to increase. This contact included text messages, emails, and jokes, which Houck found inappropriate, including two animated sexual text messages and one pornographic email. Houck also testified that Engel would make comments such as "Mmm, nice breasts," and other sexually suggestive remarks. Docket 25-1 at 6. Additionally, Engel would make sexual comments to Houck about Todd and sexual gestures while standing in the door of Houck's office. Houck told Engel that he was "disgusting," but she never filed a formal complaint regarding Engel's behavior. Docket 25-1 at 3.

After receiving a sexual image via text message from Engel some time in April or May 2010, Houck told Engel to stop sending her messages and to stop coming by her office. Engel stopped contacting Houck, but he continued to contact Todd during the workday. Todd's work suffered as a result. On July 8, 2010, Houck told Todd that Todd was spending too much time with Engel and that it was negatively impacting the quality of her work.

The following Monday, July 12, 2010, Houck was fired[1] by Engel. Houck

recalled the conversation between herself and Engel as follows:

> A:  I think it was Monday. Yes, it was Monday morning. I came in to
> work, came into my office, turned on my computer, went out to get a
> cup of coffee, came back into my office. And, as I did, Bill Engel
> followed me in and shut the door behind him. And I sat down at my
> desk, and he sat in the chair in front of me and said: "We're going to
> fire you anyway, but I'm going to give you a chance to leave with
> dignity. You've been bad-mouthing me and others, and we don't
> want you here anymore." I don't remember exactly what he said.
>
> Q:  I understand that.
>
> A:  But it was basically that gist.
>
> Q:  So he said, "We're going to anyway," meaning –
>
> A:  Yes.
>
> Q:  – that he, Bill Engel, couldn't do it; but, "I'm giving you a heads-up
> that Mike [Mitchell] is going to fire you." Is that the way you
> understood it?
>
> A:  That's what I understood, yes.
>
> Q:  And "Hey, you could quit now and avoid being fired"?

---

[1] Engel disputes Houck's interpretation of their conversation, *see* Docket 25-5 at 3, and Mitchell contends that he never intended to fire Houck and that he never gave Engel permission to fire Houck, *see* Docket 25-2 at 2. At this stage of litigation, the court views the evidence in the light most favorable to Houck and draws all reasonable inferences in her favor. Therefore, the court accepts Houck's version of the conversation leading to her departure from ESA.

A:  Yes.

Docket 25-1 at 6. Following that conversation with Engel, Houck packed her belongings and left ESA, believing she had been terminated.

Houck testified that even though Engel was not technically her supervisor, she understood that "whatever [Engel] wanted he would get; Mr. Mitchell would pretty much go along with whatever he wanted; and that, if he didn't like me he could get rid of me. He made that very clear to me." *Id.* at 2. Houck also testified that she did not report Engel's conduct to Mitchell "because I didn't think it would do any good, because, from my observations, it seemed that Mr. Mitchell didn't care what Bill Engel did. And Bill Engel had told me that he could do whatever he wanted." *Id.* at 8. Additionally, Houck testified that she could not remember if she was ever given a copy of the ESA employee handbook containing its sexual harassment reporting policy. *Id.* at 7.

Following her termination from ESA, Houck filed suit in this court. She alleges that ESA and Engel engaged in gender discrimination, sexual harassment, and retaliation prohibited under Title VII. She also alleges claims for intentional infliction of emotional distress and breach of contract, and she seeks to hold ESA liable under a theory of vicarious liability. She requests both compensatory and punitive damages.

## STANDARD OF REVIEW

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must present admissible evidence showing there is no dispute of material fact or must show that the nonmoving party has not presented admissible evidence to support an element of the case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56(c). If the moving party meets its burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)).

Summary judgment should not be granted if there is a material factual dispute that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

5

## DISCUSSION

### I.    Title VII Claims

Title VII of the Civil Rights Act of 1964 prohibits an employer from

discriminating against employees with respect to their compensation, terms,

conditions, or privileges of employment, because of race, color, religion, sex, or

national origin. *See* 42 U.S.C. § 2000e-2(a)(1). Additionally, an employer may not

retaliate against an employee because the employee opposed an unlawful employment

practice. 42 U.S.C. § 2000e-3(a).

Before reaching the Title VII claims themselves, the court will address the issue

of Engel's individual liability. Engel argues that individuals cannot be held liable under

Title VII. Docket 26 at 16. Houck contests this argument but provides no controlling

authority on that point. *See* Docket 27 at 17-21 (discussing Title VII, agency principles,

and congressional intent). In fact, the only Eighth Circuit case cited by Houck notes

the "clear consensus" that Title VII does not impose personal liability on co-workers

or supervisors.  *See Lenhardt v. Basic Inst. of Tech., Inc.*, 55 F.3d 377, 381 (8th Cir. 1995).

Following *Lenhardt*, the Eighth Circuit has held that Title VII does not impose

personal liability on either supervisors or co-workers. *See Van Horn v. Best Buy Stores,

L.P.*, 526 F.3d 1144, 1147 (8th Cir. 2008) ("The district court properly granted

summary judgment in favor of Mr. Clark on the Title VII claim because that law does

not provide for an action against an individual supervisor . . . ."); *Powell v. Yellow Book*

6

*USA, Inc.*, 445 F.3d 1074, 1079 (8th Cir. 2006) ("Title VII addresses the conduct of employers only and does not impose liability on co-workers . . . ."). Therefore, Engel's motion for summary judgment on Houck's Title VII claims is granted, and the court will evaluate Houck's Title VII claims with respect to ESA only.

In the introduction to her complaint, Houck requested relief "from Defendants' violations of laws proscribing sex discrimination, wrongful termination, retaliation, and creating a hostile work environment in employment . . . ." Docket 1 at 1. In Count I, she alleges discrimination and sexual harassment "in direct violation of 42 U.S.C. § 2000e-2, *et seq*." Docket 1 at 6-7. In framing the manner in which ESA allegedly violated Title VII, the parties have focused on three theories: gender discrimination, sexual harassment, and retaliation.

**A.   Gender Discrimination**

To survive summary judgment on a gender discrimination claim, an employee can either produce direct evidence of discrimination or create an inference of discrimination under the burden-shifting framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005) *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1058 (8th Cir. 2011). Direct evidence of discrimination is " 'evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the

7

adverse employment action.' " *Id.* (quoting *Russell v. City of Kansas City, Mo.*, 414 F.3d 863, 866 (8th Cir. 2005)). Here, Houck produces no direct evidence of discrimination. As a result, the court will analyze Houck's claim under the *McDonnell Douglas* burden-shifting framework.

Under the *McDonnell Douglas* burden-shifting framework,  an employee must establish a prima facie claim of discrimination. *Id.* If an employee establishes a prima facie claim, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. *Id.* If the employer meets its burden, then the burden shifts back to the employee to show that the employer's reason is really a pretext for discrimination. *Id.* To establish a prima facie claim of gender discrimination, Houck must show that (1) she belonged to a protected class; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated males. *Id.* (citing *Hesse v. Avis Rent A Car Sys.*, 394 F.3d 624, 631 (8th Cir. 2005)). The fourth element can also be met if Houck provides "some other evidence that would give rise to an inference of unlawful discrimination." *Id.* (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003)).

Houck states that "there is no issue of fact as to the first two elements of a prima facie showing." Docket 27 at 6. Because Houck is a woman, she is a member of a protected class. *See Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

8

Mitchell stated in his deposition that he did not fire Houck or give permission for her to be fired, Docket 25-2 at 2, allowing the court to draw the reasonable inference that, from Mitchell's perspective, she was performing her job at an acceptable level. Based on Houck's testimony, the court will assume that Houck was fired and that she suffered an adverse employment action.

The focus is on the fourth element of the prima facie claim—whether there is evidence that Houck was treated differently than similarly situated males. But Houck provides no evidence relating to the treatment of similarly situated males. There is no evidence in the record regarding whether ESA fired only female employees and not male employees. The only evidence in the record from which the court could draw an inference of discrimination is the testimony of Mitchell in which he admitted that ESA rarely hired female field employees. Docket 25-2 at 2. But Houck did not work in a field position, so any female field employees would not be similarly situated to Houck. Furthermore, Mitchell testified that the lack of female field employees was due to a lack of female applicants for those positions rather than any policy or action of ESA. *Id.* There is no evidence in the record to dispute this claim. In fact, from the record before the court, it appears that ESA hired more females than males for office positions. *See* Docket 25-1 at 7-8 (stating that Mark Engel, no relation to the defendant in this case, was the only male employee in the office, which also employed Houck, Todd, Barb Quintard, and Sue Edwards). Houck provides no evidence, beyond a bare

9

assertion, that the lack of female field employees is due to discrimination. Because Houck has failed to introduce evidence to meet her burden with respect to the fourth element of her prima facie claim of gender discrimination, ESA's motion for summary judgment on Houck's Title VII gender discrimination claim is granted.

## B.   Sexual Harassment

Houck claims that she was subjected to sexual harassment in violation of Title VII. The Supreme Court has recognized two types of actionable sexual harassment, commonly referred to as quid pro quo harassment and hostile work environment harassment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20 (1993). "Both quid pro quo and hostile work environment sexual harassment claims are grounded in the same legal theory under Title VII, the former involving an explicit, and the latter a constructive, change in conditions of employment." *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004). Sexual harassment that results in a tangible employment action is considered quid pro quo, and a plaintiff "need not prove that the offensive conduct is severe or pervasive because any carried-out threat is itself deemed an actionable change in the terms or conditions of employment." *Id.* at 1026-27. On the other hand, sexual harassment that does not result in a tangible employment action can constitute hostile work environment harassment if it is severe enough. *See Newton v. Cadwell Labs.*, 156 F.3d 880, 883 (8th Cir. 1998).

10

### 1.    Quid Pro Quo

To demonstrate a prima facie claim of quid pro quo sexual harassment, a plaintiff must show:

> (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment.

*Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1006 n.8 (8th Cir. 2000). Because Houck is a woman, she satisfies the first element. *See Quick*, 90 F.3d at 1377. With respect to the second element, whether Houck was subject to unwelcome harassment in the form of sexual advances or requests for sexual favors, "[t]he proper inquiry is whether the plaintiff indicated by [her] conduct that the alleged harassment was unwelcome." *Id.* at 1378. Houck stated that Engel's comments were unwelcome and that she told him he was "disgusting." Docket 25-1 at 3. Although Houck stated that Engel never directly asked her for sexual favors or propositioned her as a condition of her employment, Docket 25-1 at 3, she did testify that Engel would comment on her breasts and make other sexually suggestive remarks. *Id.* at 6. These facts are sufficient for Houck to create a question of fact as to whether she was subjected to unwelcome harassment.

With respect to the third element, whether the harassment was based on Houck's sex, Houck "must . . . prove that the conduct at issue was not merely tinged

11

with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex.' " *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 965 (8th Cir. 1999) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). "When 'sexual behavior [is] directed at a woman [it] raises the inference that the harassment is based on her sex.' " *Sheriff v. Midwest Health Partners, P.C.*, 619 F.3d 923, 929 (8th Cir. 2010) (alterations in original) (quoting *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir. 1992)). Additionally, "[e]vidence that members of one sex were the primary targets of the harassment is sufficient to show that the conduct was gender based for purposes of summary judgment." *Quick*, 90 F.3d at 1378.

ESA argues that Engel's conduct was not directed at Houck or women in particular because Engel sent the offensive emails to members of the office regardless of gender. Docket 26 at 8-9. But ESA fails to account for Engel's other behavior, such as the gestures made in Houck's doorway and Engel's comments directed at Houck, particularly those referencing Houck's breasts. Based on that conduct, Houck has presented sufficient evidence to create a question of fact with respect to the third element of her prima facie claim of quid pro quo sexual harassment.

With respect to the fourth element, Houck must show that submitting to Engel's conduct was an express or implied condition of her employment or that her refusal to submit resulted in a tangible job detriment. Assuming that Houck could show that she was terminated by ESA, she would need to show that the termination

12

was somehow linked to her refusal to submit to Engel's harassing behavior. *See Anderson v. Family Dollar Stores of Ark., Inc.*, 579 F.3d 858, 863 (8th Cir. 2009) (requiring that the tangible employment action "result[] from a refusal to submit to a supervisor's sexual demands"). Houck herself stated that "I'm sure the reason that I was let go was because I called Pam [Todd] into my office and told her that she needed to stop talking so much to Bill during the day because it was affecting her work . . . ." Docket 25-1 at 6. Houck later agreed that she was sure her conversation with Todd about Todd's work was the reason she was fired and that nothing else played a role in her alleged termination. *Id.* Houck does not characterize her conversation with Todd as anything other than a supervisor discussing poor work performance with an employee. Houck may have been terminated, but Houck's own testimony makes clear that she was not terminated for refusing to submit to Engel's harassing behavior.

The timing of Houck's termination also supports the conclusion that her termination was due to her disciplining Todd and not her complaint to Engel about his behavior. Houck complained to Engel about his behavior roughly a month before she was terminated, and she testified that Engel stopped his offensive behavior at that time. But she was terminated the Monday following her conversation with Todd. The facts, and Houck's own testimony, make clear that her termination was due to her conversation with Todd and not to her refusal to submit to Engel's harassment.

13

Accordingly, Houck has not established the fourth element, and ESA's motion for summary judgment is granted on Houck's quid pro quo sexual harassment claim.

### 2.    Hostile Work Environment

Sexual harassment that does not result in a tangible employment action can still violate Title VII if it creates a hostile or abusive working environment. *Brenneman v. Famous Dave's of America, Inc.*, 507 F.3d 1139, 1143 (8th Cir. 2007). Unlike quid pro quo harassment, the offensive conduct must be severe or pervasive to be actionable as hostile work environment harassment. *See Henthorn*, 359 F.3d at 1026-27. Hostile work environment claims are evaluated using the *McDonnell Douglas* burden-shifting framework. *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004).

> The elements of a prima facie hostile-work-environment claim are: 1) the employee is a member of a protected group; 2) she was subject to unwelcome harassment; 3) there was a causal nexus between the harassment and her membership in the protected group; 4) the harassment affected a term, condition, or privilege of employment; and, in a case alleging harassment by non-supervisory employees, 5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action.[2]

*Turner*, 421 F.3d at 695 (citing *Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir. 1999)). As the court noted with respect to Houck's quid pro quo harassment claim, Houck is a

---

[2] In her brief, Houck recites the prima facie elements of a hostile work environment claim based on actions by a non-supervisory employee, Docket 27 at 6, and argues that ESA knew or should have known of Engel's harassment. But Houck also argues that Engel was a supervisor and in fact terminated her. The court construes these contradictory positions as arguments in the alternative.

member of a protected group and has introduced facts sufficient to support a finding that she was subject to unwelcome harassment. There are also sufficient facts to establish a causal nexus between at least some of Engel's behavior and Houck's gender, such as Engel's comments about Houck's breasts.

The fourth element, whether the harassing conduct was severe enough to alter a term, condition, or privilege of employment, "is a high threshold." *Sutherland v. Mo. Dep't of Corr.*, 580 F.3d 748, 751 (8th Cir. 2009). A plaintiff "must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult.' " *Id.* (quoting *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002)). The harassment must also be both subjectively and objectively offensive, and must be " 'extreme in nature and not merely rude or unpleasant.' " *Id.* (quoting *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006)).

The court must consider the totality of the circumstances to determine if the workplace environment rises to the requisite level of severity. *Id.* " 'There is no bright line between sexual harassment and merely unpleasant conduct . . . .' " *Henthorn*, 359 F.3d at 1026 (quoting *Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997)); *see also Harris*, 510 U.S. at 22 (stating that there is no precise mathematical test or formula for a hostile work environment). Relevant factors "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

15

employee's work performance." *Harris*, 510 U.S. at 23. Additionally, "[a] work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it 'into a series of discrete incidents.' " *Hathaway*, 132 F.3d at 1222 (quoting *Burns*, 955 F.2d at 564).

Engel's allegedly harassing behavior consists of the three sexual images he sent to Houck and others and the sexual comments and gestures he made to Houck. Houck never alleges that Engel physically threatened or touched her, but she did testify that she felt intimidated by Engel because Engel "had told me that he could do whatever he wanted." Docket 25-1 at 8. Houck's reluctance to report Engel's behavior is evidence of a direct or implied threat by Engel that he could "make [Houck's] life miserable." *Id.* at 2. That type of intimidating atmosphere is relevant to the severity of Engel's allegedly harassing behavior.

It is undisputed that Engel only sent three sexual images to Houck, but the frequency of his comments and gestures is unclear from the record. Houck testified at one point that Engel's gestures in her office door occurred on "more than one occasion." *Id.* at 3. One incident of harassment, unless extremely serious, would not be sufficient to establish harassment that altered the terms, conditions, or privileges of Houck's employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). But later in her deposition, Houck stated that Engel's jokes and comments happened often and that other employees "would have to be blind" to have failed to observe Engel's

16

behavior. *Id.* at 8. Houck only worked for ESA for a short time, and all the behavior she complains of happened in the span of a few months rather than being spread out over years. If Engel's offensive comments, gestures, and other inappropriate and unwelcome behavior happened frequently enough, it could support a finding that the harassment Houck experienced was severe enough to alter the terms, conditions, or privileges of her employment.

" '[O]nce there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury.' " *Eich v. Board of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 759 (8th Cir. 2003) (quoting *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998)). Houck has introduced evidence of both improper conduct by Engel and subjective offense on her part. Factual questions remain on whether Engel's conduct rose to the level of frequency and severity required by Title VII. Therefore, Houck has met her burden to show a genuine issue of material fact with respect to the fourth element of her prima facie claim of hostile work environment sexual harassment.

If Engel was a supervisor, then Houck is not required to show the fifth element, that ESA knew or should have known of Engel's behavior and that ESA failed to take remedial action.[3] *See Turner*, 421 F.3d at 695. According to Houck, Engel terminated

---

[3] Engel's supervisory status is crucial because it is undisputed that Houck did not report Engel's behavior to anyone other than Engel himself and Todd, Houck's

her.[4] ESA contends instead that Houck simply quit after her conversation with Engel and that ESA did not fire her. Furthermore, ESA states that Engel did not have authority to fire Houck.

Generally, an employee's status as a supervisor is clear and can be determined as a matter of law at the summary judgment stage. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2449-50 (2013). But in *Vance*, the Supreme Court acknowledged that, in unusual cases, an employee's supervisory status might present a factual question. *See id.* at 2449 n.12, 2450. *Vance* also instructed that "the authority to take tangible employment actions is the defining characteristic of a supervisor . . . ." *Id.* at 2248; *accord Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1057 (8th Cir. 2004).

With respect to apparent authority, the Eighth Circuit has noted that, at least in one case, "apparent authority would be an insufficient basis to support a finding of supervisor status." *Weyers*, 359 F.3d at 1057 n.7. That holding traces back to the Supreme Court's statement that:

> In the usual case, a supervisor's harassment involves misuse of actual power, not the false impression of its existence. Apparent authority analysis therefore is inappropriate in this context. If, in the unusual case,

---

assistant. Docket 25-1 at 8. Therefore, if Engel is not a supervisor, Houck has not introduced evidence to show that ESA knew or should have known of the harassment and failed to take appropriate remedial action.

[4] Houck does not contend that she was constructively discharged. *See, e.g., Brenneman*, 507 F.3d at 1144 (explaining constructive discharge).

> it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one.

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998). The general rule that apparent authority does not confer supervisor status comports with the Supreme Court's preference, enunciated in *Vance*, for a bright-line test as to whether an individual is a supervisor.

Houck knew that Engel was not her direct supervisor. Docket 25-1 at 2. It is undisputed that Engel did not direct Houck's day-to-day activities, did not play a managerial role with respect to Houck, and did not have Mitchell's authority to terminate Houck. But although Engel conceded that he did not have Mitchell's permission to fire Houck, Engel himself seemed unclear on whether he had the actual authority to terminate ESA employees. *See* Docket 25-5 at 3 ("I'm not sure if I did or not [have the power to hire or fire anybody at ESA].").

Houck has presented enough evidence to create a question of fact as to whether Engel terminated her from ESA. If a jury were to believe Houck's version of the conversation between Houck and Engel, and if it believed Houck's testimony that based on Engel's close relationship with Mitchell, Engel could take any action he wanted, the jury could reasonably find that Engel fired Houck.[5] Under the Supreme

---

[5] Mitchell was clear that he did not give Engel permission to fire Houck, so if a jury concluded that Engel's conversation with Houck amounted to a termination, it

Court's bright-line standard in *Vance*, the power to terminate would confer supervisor status on Engel. Even if Engel did not actually terminate Houck, based on the unique facts presented in this case a jury could find that Houck reasonably believed Engel had terminated her. Engel's supervisory status, or his apparent supervisory status, is a factual question requiring an interpretation of the conversation between Engel and Houck and requiring a determination of the reasonableness of Houck's belief that she was terminated. Viewing the evidence in the light most favorable to Houck, the court finds that Houck has made her prima facie claim.

Because Houck has met her prima facie burden, the burden shifts to ESA to produce a legitimate, nondiscriminatory reason for Engel's conduct. *See Erenberg*, 357 F.3d at 792 (applying the *McDonnell Douglas* framework to hostile work environment claims). ESA argues that Houck was terminated for reasons unrelated to Engel's conduct. Docket 26 at 14-15 (claiming that Houck was terminated for insubordinate conduct and poor relationships with coworkers). But Mitchell's testimony undermines the credibility of that claim because he stated that he did not fire her and that he didn't know of a problem until this lawsuit was filed. Docket 25-2 at 2. If Mitchell, who according to ESA was the only person with the authority to fire Houck, was not aware at the time of the grounds ESA now provides for her termination, the legitimacy of the

---

would have been Engel and not Mitchell who made the decision to fire Houck. Engel was not merely acting as Mitchell's messenger. *See* Docket 25-2 at 2.

proffered reasons is called into question. Even if ESA can put forth a legitimate reason for Houck's termination, it has not provided any justification for Engel's other behavior, such as his sexual comments and gestures, and the three sexual images he sent to Houck and others. *See Quick*, 90 F.3d at 1378 ("[A]n employer could never have a legitimate reason for creating or permitting a hostile work environment." (internal quotations omitted)); *Faragher*, 524 U.S. at 779-98 ("[A] pervasively hostile work environment of sexual harassment is never (one would hope) authorized . . . ." (internal quotations omitted)).

Houck has met her initial burden, and ESA has not articulated a nondiscriminatory explanation for Engel's actions. Accordingly, summary judgment is denied on Houck's claim for hostile work environment sexual harassment in violation of Title VII.[6]

## C.   Retaliation

### 1.   ESA

Title VII prohibits an employer from retaliating against an employee because the employee "opposed any practice made an unlawful employment practice by" Title VII or "has made a charge, testified, assisted, or participated in any manner in an

---

[6] ESA does not present the issue of whether, if the alleged sexual harassment did not result in the tangible employment action, it would be entitled to the affirmative defense articulated by the Supreme Court in *Ellerth* and *Faragher*.

investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a).[7] To

establish a prima facie claim of retaliation, Houck must demonstrate that she engaged

in a protected activity, she suffered a materially adverse employment action, and the

materially adverse employment action was causally connected to the protected activity.

*Muor v. U.S. Bank Nat'l Ass'n*, 716 F.3d 1072, 1078 (8th Cir. 2013). If Houck can

establish a prima facie claim, a presumption of unlawful retaliation arises and places an

obligation on ESA to produce evidence of a legitimate, nonretaliatory reason for its

actions. *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 634 (8th Cir. 2000). If ESA carries its

burden, the presumption disappears and the burden shifts back to Houck to show that

ESA's explanation is pretextual and that unlawful retaliation was the real reason she

was terminated. *Id.*

It is uncontested that Houck did not bring a charge, testify, assist, or participate

in a proceeding under Title VII before she was terminated. Therefore, any protected

activity must fall under the opposition prong of Title VII's retaliation statute. Houck

asserts two instances of potentially protected conduct: first, that she told Engel to stop

---

[7] In addition to Title VII, Houck appears to allege retaliation under SDCL 20-13-10. *See* Docket 27 at 20. The South Dakota Supreme Court has interpreted SDCL 20-13-10 in accordance with federal case law under Title VII. *Huck v. McCain Foods*, 479 N.W.2d 167, 169 (S.D. 1991) (holding that SDCL 20-13-10 is comparable to Title VII in the context of sexual harassment). Therefore, the court will analyze Houck's Title VII retaliation claim against ESA and her state-law retaliation claim against ESA together.

his offensive behavior, and second, that she told Todd that Todd's workplace relationship with Engel was interfering with Todd's work. *See* Docket 27 at 13.

### a.   Statement That Engel's Behavior was Unwelcome

Houck alleges she was terminated in retaliation for telling Engel that his conduct was unwelcome and harassing. An employee may establish that she engaged in a protected activity when she tells her supervisor to stop offensive conduct. *Ogden*, 214 F.3d at 1007. A materially adverse retaliatory action requires the employee to show that the adverse action " 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Littleton v. Pilot Travel Centers, LLC*, 568 F.3d 641, 644 (8th Cir. 2009) (quoting *Burlington Northern & Santa Fe Rwy. v. White*, 548 U.S. 53, 68 (2006)). Even if Houck could establish that the circumstances surrounding her departure from ESA amounted to a materially adverse employment action, she would have to demonstrate a causal connection between her protected activity and the alleged adverse employment action.

Houck contends that she can meet her burden of showing a causal connection because she was terminated by Engel "approximately one month after Houck complained to Engel about the sexual harassment and within four days [of] Houcks' [sic] complaints regarding Todd's work performance due to her relationship with Engel . . . ." Docket 27 at 13. In circumstances where an employee relies on the timing of an adverse employment action to show causation, the Eighth Circuit has stated:

23

> Generally, more than a temporal connection is required to present a genuine factual issue on retaliation, and only in cases where the temporary [sic] proximity is very close can the plaintiff rest on it exclusively. As more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation. The inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months.

*Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011) (internal quotation marks and citations omitted). While there is a close temporal connection between Houck's termination and the alleged protected activity, Houck conceded in her deposition that Engel fired her because she reprimanded Todd, not because she told Engel to stop harassing her. Docket 25-1 at 6 ("And, in fact, I'm sure that the reason that I was let go was because I called Pam into my office and told her that she needed to stop talking so much to Bill during the day because it was affecting her work, and the next day is when Bill basically – when Bill forced me to leave."). Because Houck has not established a causal connection between her request to Engel to stop his offensive behavior and her termination, Houck has not met her prima facie burden.

### b.   Statement That Todd's Relationship With Engel Interfered With Todd's Work

Houck also alleges she was terminated in retaliation for telling Todd that Todd needed to spend less time with Engel at work because Todd's relationship with Engel was interfering with Todd's work. To demonstrate protected activity under the

24

opposition prong, an employee is not required to show that the conduct she opposed in fact violated Title VII, but must demonstrate "a good faith, reasonable belief that the underlying conduct violated the law." *Stuart*, 217 F.3d at 634. Here, there is no evidence that Houck subjectively thought she was opposing an activity made illegal under Title VII when she spoke with Todd. In fact, Houck's deposition testimony indicates that Houck was primarily concerned with Todd's work performance, not Engel's conduct towards Houck. *See* Docket 25-1 at 6.

Even if Houck subjectively believed she was opposing an activity that violated the law, that belief was not objectively reasonable. There is no evidence of coercion, harassment, quid pro quo, or other illegal conduct between Engel and Todd. Houck does not tie Engel's inappropriate behavior to her conversation with Todd at all. It is unreasonable for an employee to assume, without more, that a workplace relationship between two consenting adults, or poor job performance due to lack of focus, violates Title VII.

Houck has not shown a causal connection between her request that Engel stop his offensive behavior and her termination. The only event that Houck alleges is causally connected to her termination is not protected activity. Therefore, summary judgment is granted on Houck's retaliation claims against ESA.

25

### 2.   Engel

Although the court previously found that Engel was not subject to liability under Title VII, Houck alleges that he is liable for retaliation[8] under South Dakota's equivalent law, found in SDCL 20-13-10. *See* Docket 27 at 20 (arguing that "[f]iring someone for reporting sexual harassment is sufficient conduct under SDCL 20-13-10" to impose individual liability). Previously, this court found that, if faced with the question, the South Dakota Supreme Court would likely find that SDCL 20-13-10 creates individual liability for a supervisor. *See Johnson v. Gateway, Inc.*, No. CIV. 04-4186-KES, 2007 WL 1231657, at *10-11 (D.S.D. April 24, 2007).

Assuming that Engel could be individually liable under SDCL 20-13-10, Houck would still need to establish that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection. *See Williams v. S.D. Dept. of Agric.*, 779 N.W.2d 397, 402 (S.D. 2010) (laying out the elements of retaliation); *Huck*, 479 N.W.2d at 169 (interpreting SDCL 20-13-10 in accordance with federal case law under Title VII). For the same reasons set forth with respect to Houck's retaliation claims against ESA, Engel is entitled to summary judgment on the state-law retaliation claims.

---

[8] Houck does not attempt to apply SDCL 20-13-10 to any of her other Title VII claims, so the court will only consider it in the context of whether Engel can be individually liable for retaliation.

## II.   Intentional Infliction of Emotional Distress

In Count II, Houck claims that ESA and Engel are liable for intentional infliction of emotional distress. A federal court exercising supplemental jurisdiction over claims arising under state law applies the substantive law governing the claims, which here is South Dakota law. *See Rau v. Roberts*, 640 F.3d 324, 327-28 (8th Cir. 2011) (citing *Emmenegger v. Bull Moose Tube Co.*, 324 F.3d 616, 624 n.9 (8th Cir. 2003)). Under South Dakota law, to prevail on a claim for intentional infliction of emotional distress a plaintiff must show "(1) an act by defendant amounting to extreme and outrageous conduct; (2) intent on the part of the defendant to cause plaintiff severe emotional distress; (3) the defendant's conduct was the cause in-fact of plaintiff's injuries; and (4) the plaintiff suffered an extreme disabling emotional response to defendant's conduct." *Tibke v. McDougall*, 479 N.W.2d 898, 906 (S.D. 1992).  "For conduct to be 'outrageous,' it must be so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 907 (citing Restatement (Second) of Torts § 46 cmt. (d)).

ESA and Engel argue that Engel's behavior, though inappropriate, did not rise to the level of extreme and outrageous conduct. Docket 26 at 17. They also argue that Houck never alleges any type of extreme or disabling emotional response to the alleged harassment. *Id.* Houck does not point to any evidence that would support the elements of her claim. Because Houck does not show any specific evidence in the

27

record that creates a genuine question of material fact on her intentional infliction of emotional distress claim, summary judgment on that claim as to both ESA and Engel is granted.

## III.   Vicarious Liability

In Count III, Houck alleges that ESA[9] is liable for Engel's conduct under a theory of vicarious liability, and both sides address vicarious liability and agency in their written submissions. In her brief, Houck explains the scope of her vicarious liability position as follows: "Defendant Engel was acting as an agent within the scope of his employment with ESA when he took it upon himself to terminate the employment of Plaintiff Houck after she complained of the sexual harassment." Docket 27 at 21.

Title VII already imposes liability on an employer for, among other prohibited actions, retaliation in violation of Title VII. Houck has failed to put forth evidence supporting her prima facie claim of Title VII retaliation, and general state-law agency allegations do not relieve her of that burden. Additionally, because the court is granting summary judgment on all of Houck's claims against Engel individually, there

---

[9] Although the complaint is not clear as to which defendant is named in Count III, Houck writes in her brief that she "has stated claims for individual liability against Defendant Engel as to the sexual discrimination, intentional infliction of emotional distress and retaliation." Docket 27 at 17. Accordingly, the court construes Count III as brought against ESA only.

are no issues for trial with respect to Houck's vicarious liability claim, to the extent that it represents an independent claim.

## IV.   Breach of Contract

In Count V, Houck asserts a claim for breach of contract against ESA.[10] Under South Dakota law, the elements of a breach of contract action are an enforceable promise, a breach of the promise, and resulting damages. *Guthmiller v. Deloitte & Touche, LLP*, 699 N.W.2d 493, 498 (S.D. 2005). Houck contends that because ESA "subject[ed] the Plaintiff to sexual harassment, retaliation and the wrongful termination of Houck's employment for complaining about the sexual harassment, and a hostile work environment, ESA breached the employment contract with the Plaintiff and they [sic] terminated her employment in violation of Title VII, for exercising her protection under that act." Docket 27 at 22.

Houck fails to point to any facts tending to prove that she had an enforceable contract with ESA. Houck does not provide the employee handbook that allegedly incorporated ESA's policy. In fact, Houck stated in her deposition that she did not

---

[10] It is unclear from the complaint whether Houck is also asserting her breach of contract claim against Engel. Engel asserts that there was never a contract between himself and Houck. Docket 26 at 16 n.4. Houck never mentions a contract between herself and Engel. *See* Docket 27 at 21-22. Therefore, the court construes Count V as brought against ESA only.

remember ever seeing or receiving a copy of ESA's employee handbook. Docket 25-1 at 7.

To the extent that Houck argues that her termination was a breach of a contract, South Dakota is an at-will employment state, and for an employer to relinquish its power to fire an employee at will, the employer must explicitly adopt a termination for-cause procedure. *See Holland v. FEM Elec. Ass'n*, 637 N.W.2d 717, 720 (S.D. 2001). The fact that a company puts a harassment policy in place does not act as a waiver or relinquishment of its status as an at-will employer. *See Johnson v. Gateway, Inc.*, No. CIV. 04-4186-KES, 2007 WL 1231657, at *14-15 (D.S.D. April 24, 2007).

Rather than pointing to specific evidence in the record that creates a question of fact for trial, Houck relies on assertions and speculation, which are insufficient to survive summary judgment. Because Houck has not shown any specific evidence that establishes a breach of contract, summary judgment is granted in favor of ESA on Houck's breach of contract claim.

## CONCLUSION

Houck has failed to make a prima facie showing of her gender discrimination, quid pro quo sexual harassment, and retaliation claims. Houck has failed to establish her intentional infliction of emotional distress and breach of contract claims. Houck has provided sufficient evidence to create factual questions with respect to her Title

VII hostile work environment sexual harassment claim against ESA, but Engel cannot be individually liable on that claim. Accordingly, it is

ORDERED that the motion for summary judgment (Docket 22) as to William Engel, Jr., is granted.

IT IS FURTHER ORDERED that the motion for summary judgment (Docket 22) as to ESA, Inc., is granted in part and denied in part consistent with this order.

Dated June 12, 2014.

BY THE COURT:


/s/ Karen E. Schreier
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE